ANDRÉ BIROTTE JR.
United States Attorney
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
CHARLES E. PELL (Cal. Bar No. 210309)
JOSHUA M. ROBBINS (Cal. State Bar No. 270553)
Assistant United States Attorneys
     8000 United States Courthouse
     411 West Fourth Street
     Santa Ana, California  92701
     Telephone:  (714) 338-3542/3538
     Facsimile:  (714) 338-3561
     Email: Joshua.Robbins@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 11-209-JST-1 |
|---|---|
| Plaintiff, | <u>Government's Response to Presentence Report and Position Regarding Sentencing as to Defendant Arturo S. Ruiz; Exhibits</u> |
| v. | |
| ARTURO S. RUIZ, | |
| Defendant. | Sentencing Date: September 20, 2013<br>Sentencing Time: 8:30 A.M.<br>Location: Courtroom of the Hon. Josephine S. Tucker |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files its response to the presentence report and position regarding sentencing as to defendant Arturo S. Ruiz.

The government's submission is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Report and Probation Office's recommendation,

and any other evidence or argument that the Court may wish to consider at the time of sentencing.

```
Dated: August 28, 2013          Respectfully submitted,

                                ANDRÉ BIROTTE JR.
                                United States Attorney

                                DENNISE D. WILLETT
                                Assistant United States Attorney
                                Chief, Santa Ana Branch Office


                                     /s/
                                JOSHUA M. ROBBINS
                                CHARLES E. PELL
                                Assistant United States Attorney

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA
```

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

TABLE OF CONTENTS..........................................................i

TABLE OF AUTHORITIES......................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.......................................1

I.   INTRODUCTION..........................................................1

II.  THE PRESENTENCE REPORT................................................2

III. THE PROBATION OFFICE'S RECOMMENDATION.................................3

IV.  THE GOVERNMENT'S RECOMMENDATION.......................................3

     A.   Nature of the Offense............................................4

     B.   History and Characteristics of Defendant.........................6

     C.   General Deterrence...............................................7

     D.   Avoidance of Unwarranted Sentencing Disparities.................10

     E.   Downward Variance...............................................13

V.   RESTITUTION..........................................................14

VI.  CONCLUSION...........................................................15

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE


**Federal Cases**

United States v. Bragg, 582 F.3d 965 (9th Cir. 2009)................8

United States v. Cohen, --- F.3d ----, No. 12-10240 (9th Cir. August 22, 2013).........................................................2

United States v. Morace, 594 F.3d 340 (4th Cir. 2010)..............8

United States v. Orlando, 553 F.3d 1235 (9th Cir. 2009)............8


**Federal Statutes**

18 U.S.C. § 286....................................................1

18 U.S.C. § 287....................................................1

18 U.S.C. § 3553(a)..........................................passim


**Other Authorities**

U.S.S.G. § 2B1.1(b)(9)(A)..........................................2

U.S.S.G. Manual ch. 2, pt. T, introductory cmt.....................7

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

On January 30, 2013, defendant Arturo S. Ruiz ("defendant") was convicted at trial of one count of violating 18 U.S.C. § 286 (Conspiracy to Defraud the United States with Respect to Claims) and 41 counts of violating 18 U.S.C. § 287 (False, Fictitious, or Fraudulent Claims Against the United States).  The United States Probation Office ("USPO") has calculated defendant's advisory Sentencing Guidelines imprisonment range as 2580 months, and recommends a custodial sentence of 216 months, a downward variance equivalent to a 13-level departure from that range.

The government agrees with the USPO's calculations, and recommends a significant custodial sentence of 216 months.  Defendant was the architect and undisputed leader of what is, by most measures, the largest and most sophisticated OID-based tax fraud scheme in history.  Through his company of dozens of employees and agents, dedicated entirely to the scheme, defendant attempted to defraud U.S. taxpayers of hundreds of millions of dollars.  He succeeded in cheating hundreds of desperate homeowners -- his customers -- out of hundreds of thousands of dollars in fees, both through the tax scheme and a preceding "land patent" fraud.  At no time has defendant demonstrated remorse or an intent to reform his conduct; instead, he has gone to great lengths to avoid responsibility.  The sentence imposed on him will not only punish defendant and protect the public from further depredation, but will send an important message to those contemplating similar tax frauds, many of whom follow closely the outcomes of cases such as this one.

**II.  THE PRESENTENCE REPORT**

The USPO prepared a Presentence Report ("PSR"), which was disclosed to the parties on April 5, 2013.  The PSR calculated a total offense level of 50.  PSR at 4, ¶¶ 105-25.  The PSR also calculated a criminal history category of I, based on zero criminal history points.  Id. at ¶¶ 127-31.  Based on a total offense level of 50 and a criminal history category of I, the PSR calculated the sentencing guideline range to be 2580 months imprisonment (equal to the statutory maximum sentence), one to three years of supervised release, a fine between $25,000 and $250,000, and a mandatory special assessment of $4,200.  Id. at ¶¶ 155-75.[1]

The government has one objection to the PSR.  In the government's view, a two-level enhancement under Guidelines § 2B1.1(b)(9)(A) should also apply because the offense involved "a misrepresentation that the defendant was acting on behalf of a charitable . . . organization."  The Ninth Circuit quite recently found that such an enhancement was appropriate where a defendant had fraudulently induced patrons of a charitable organization to invest in his company by misrepresenting that the shares would increase in value and permit the investor patrons to make large contributions to the charitable organization.  United States v. Cohen, --- F.3d ----, No. 12-10240 (9th Cir. August 22, 2013).  Here, as witnesses Harry Farquharson and Thelma Zazueta testified at trial, Ruiz and co-defendant Mendoza told Old Quest customers that Old Quest was a non-profit organization and that Old Quest would use their "donations" of 25% of their tax refunds to help provide housing for Old Quest

---

[1] The PSR does not reach a determination as to restitution.

2

customers who had lost their homes to foreclosure. Exhibits 1-3.[2] The government submits that such conduct is sufficient to trigger the enhancement. Accordingly, the government believes that the total offense level is 52. Even if applied, that adjustment would not affect the Guidelines sentencing range.

The government also notes that the intended loss amount may in fact be understated. Although summary testimony at trial, consistent with the PSR's findings, confirmed that the fraudulent refunds claimed through Old Quest exceeded $194 million, that figure does not include additional false returns submitted through co-defendant Linda Wilson in 2010, which returns would increase the total intended loss to over $200 million. However, because the government is recommending a downward variance to account for the disparity between intended loss and actual loss, it does not object to the PSR's loss finding.

### III. THE PROBATION OFFICE'S RECOMMENDATION

The USPO recommended the following sentence: 216 months imprisonment, a three-year term of supervised release, and a special assessment of $4,200. USPO Recommendation Letter at 1-2.

### IV. THE GOVERNMENT'S RECOMMENDATION

The government recommends a substantial downward variance from the Guidelines range, resulting a sentence equivalent to what would be the low end of the Guidelines range following a downward departure of 15 levels:[3]  that is, 216 months of custody, plus three

---

[2] In Exhibit 3, see ¶¶ 22-23.

[3] If the Court finds that the total offense level is 50, rather than 52, the government would recommend a downward variance equivalent to a departure of 13 levels.

3

years of supervised release, a special assessment of $4,200, and restitution in the amount of $4,570,097.91.

The statutory factors under 18 U.S.C. § 3553(a) warrant the government's recommended sentence. Several of them merit particular attention.

### A.   Nature of the Offense

Having overseen Ruiz's trial, the Court is familiar with the facts of his case. In sum, Ruiz was the architect and leader of a pair of related fraud schemes that targeted hundreds of distressed and desperate homeowners, many of them poorly-educated immigrants, and all of whom were in danger of losing their homes to foreclosure. In both cases, Ruiz enticed those victims to pay him thousands of dollars each in fees by promising to eliminate their debts or obtain for them huge tax refund checks, all through dubious and far-fetched pseudo-legal practices that he had been repeatedly warned were illegal. The latter scheme also targeted the U.S. Treasury and American taxpayers, seeking to potentially obtain, through false tax returns, hundreds of millions of dollars in unwarranted refunds. In the process, Ruiz obtained hundreds of thousands of dollars from his customers' fees, then abandoned those customers, leaving them to face foreclosure, with nothing but outstanding fines from the IRS.

Particularly striking is the degree of organization evident in the scheme. Ruiz did not loosely coordinate with a mere handful of confederates. He constructed a company of two dozen employees and dozens of associated recruiter/agents, operating from a two-story office with designated departments, modern information technology equipment and business supplies, an organizational chart, payroll documents, and other accoutrements of a proper business. The

company's hundreds of customers were solicited, in part, through honed presentations delivered in two on-site theater-style rooms stocked with audio-visual equipment. Yet the company's only business was creating and filing false IRS forms in order to fraudulently claim hundreds of millions of dollars in tax refunds. Such a level of operational sophistication is unprecedented in the history of OID-based tax refund schemes, and far surpasses that of the typical tax preparer case.

Also notable is the degree of planning that went into the scheme's effort to circumvent the IRS fraud-detection systems. Ruiz and his colleagues prepared the fraudulent Forms 1099-OID on-site in order to frustrate the IRS's basic methodology for verifying return information, which relies on cross-checking information from multiple sources, such as the taxpayer and his or her employer or bank. In addition, the schemers designed a form email to send to the IRS automated screening department, which flagged the Forms 1099-OID as potentially fraudulent; the email falsely stated, under penalty of perjury, that the 1099-OIDs were valid. That a handful of returns slipped through the IRS system and several refunds were initially issued is testament to the schemers' calculation and capabilities.

Equally significant is the nature of the victims whom Ruiz targeted, and the impact the scheme had on them. Many of Old Quest's customers were uneducated immigrants with limited English skills and low incomes, who were behind on their mortgages, in danger of losing their homes, and desperate for a solution. Ruiz marketed to them not one but two fraudulent schemes, charging them thousands of dollars apiece for services that were worse than

5

worthless. When the customers wound up with no homes, no refunds, and thousands of dollars in IRS fines, Ruiz and his co-conspirator Francisco Mendoza took what funds they could (over a quarter-million dollars) and departed, leaving the customers to fend for themselves. Some of the customers are still paying the fines.

### B. History and Characteristics of Defendant

The charged scheme and the related land patent scheme do not comprise the entirety of Ruiz's unlawful conduct. As detailed at his trial, Ruiz failed to file tax returns for years 2002-2005, 2007, and 2009, even though he made over $67,000 in income for 2002, over $86,000 in 2003, and over $195,000 in 2004, and obtained hundreds of thousands of dollars in 2009 from the charged scheme. Witness Maria Echeverria testified that Ruiz boasted to her about never paying taxes.

It appears that even while in custody, Ruiz has sought to become involved in additional fraudulent schemes. Exhibit 4 contains a copy of a flyer confiscated from Ruiz at the Santa Ana Jail in March 2013, while he remained detained pending sentencing. It reads as follows:

Generate unlimited income!

Buy your own home!

You can pay your home in one year or less.

If you are in the process of losing your home

AVOID FORECLOSURE!![4]

---

[4] The second page of the flyer contains detailed terms and conditions referring to a company called "MHN." The government believes that "MHN" is an acronym for "MyHubNet," the company that Ruiz formed at or about the time Old Quest was raided by the IRS.

6

Moreover, as the attached email message shows, Ruiz lied to the Santa Ana Jail staff, falsely claiming that the document was part of the discovery in this case. Id. In fact, Ruiz used the jail's law library to produce the foreclosure relief flier. Id.

Thus, it seems that notwithstanding his indictment, trial, conviction, and imminent sentencing in this case, Ruiz has continued with his pattern of soliciting funds from vulnerable persons in financial distress. Such persistent misconduct speaks to the importance of both specific deterrence and protection of the community from the ongoing economic danger that Ruiz presents.

**C. General Deterrence**

Section 3553(a)(2)(B) provides that in determining the particular sentence to be imposed, the Court should consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct," which includes both specific and general deterrence

General deterrence is critical in criminal tax cases, because of the voluntary compliance nature of the tax system and the relative infrequency with which criminal tax prosecutions are filed. Accordingly, the Sentencing Commission issued a policy statement on tax cases for general deterrence:

> Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Manual ch. 2, pt. T, introductory cmt.

7

The Ninth Circuit has affirmed the Sentencing Commission's policy. In United States v. Orlando, the Court upheld a district court's imposition of an upward variance in a tax evasion case because it on the grounds that the the Guidelines range "failed to capture tax crimes' particular sensitivity to deterrence." 553 F.3d 1235, 1239 (9th Cir. 2009). In other cases, the Ninth Circuit has held that courts should consider the Sentencing Commission's policy statements and the particular need for deterrence in tax cases, noting that "Congress, in enacting the law, and the Sentencing Commission, in prescribing prison for tax offenses, set out a policy." United States v. Bragg, 582 F.3d 965, 969 (9th Cir. 2009) (vacating probationary sentence in a tax fraud case and remanding to the district court where it had expressed "doubt that deterrence works in tax cases"). See also United States v. Morace, 594 F.3d 340, 349 (4th Cir. 2010) ("the policy statements also reflect the Commission's view that general deterrence—that is, deterring those other than the defendant from committing the crime—should be a primary consideration when sentencing in tax cases, and that there must be a real risk of actual incarceration for the Guidelines to have a significant deterrent effect in tax evasion cases.").

The importance of deterring tax fraud through significant sentences has only increased in recent years, as tax fraud -- particularly refund fraud -- has reached epidemic proportions.[5] By the IRS's estimation, it identified and prevented over $14 billion in fraudulent refunds (claimed in 3 million "suspicious" returns) in

---

[5] See, e.g., Lizette Alvarez, With Personal Data in Hand, Thieves File Early and Often, N.Y. Times, May 26, 2012 (discussing nationwide tax fraud trend involving identity theft and false refund claims).

8

2011, and another $20 billion (5 million suspicious returns) in 2012.[6]  At the same time, IRS resources for detecting and preventing fraud are increasingly limited, and must be balanced against the need to deliver legitimate refunds promptly.[7]  As the IRS Acting Commissioner testified last year before the U.S. Senate, the IRS "cannot manually inspect 100 million refunds to ensure all are correct."[8]

To many prospective tax fraudsters, the risk/reward calculus may thus seem skewed in favor of committing fraud.  With large potential financial gains to be had, and possibly limited risk of detection, there is a powerful incentive to attempt such crimes.  The prospect of a long prison sentence for those who are caught and convicted is the primary factor discouraging such attempts.  Conversely, if penalties are light for even major tax fraud schemes, then there will be virtually no source of deterrence, and the epidemic will spread.

The need for general deterrence is heightened even further in cases such as this one, which involve members of a network of tax protestors and tax fraud promoters.  The members of such networks

---

[6] See Written Testimony of Steven T. Miller, Acting I.R.S. Commissioner, at Hearing on Tax Fraud and Tax Identity Theft before the Senate Finance Committee, April 16, 2013, at 3, available at http://www.finance.senate.gov/imo/media/doc/Miller%20Testimony.pdf

[7] See Written Statement of Nina E. Olson, I.R.S. National Taxpayer Advocate, at Hearing on Identity Theft and Income Tax Preparation Fraud before the U.S. House of Representatives Subcommittee on Crime, Terrorism, and Homeland Security, June 8, 2012, available at http://www.irs.gov/pub/irs-utl/nta_testimony_idtheft_062812.pdf.

[8] See Written Testimony of Steven T. Miller, Acting I.R.S. Commissioner, at Hearing on Identity Theft before the Senate Subcommittee on Fiscal Responsibility and Economic Growth, March 20, 2012, at 2, available at http://www.irs.gov/pub/irs-utl/miller-20mar2012.pdf.

frequently monitor developments in tax fraud cases around the country, and share with one another information regarding criminal and civil tax enforcement actions, including sentences imposed in criminal cases. Indeed, the members of defendant's own scheme passed on to one another information regarding other cases involving OID fraud charges or related actions. Exhibits 5-8. The outcome of this case -- by some measures the largest OID fraud case ever filed -- will almost certainly become fodder for future such exchanges.

**D. Avoidance of Unwarranted Sentencing Disparities**

Section 3553(a)(6) provides that the Court should take into account the need to avoid unwarranted sentencing disparities among defendants with similar records who are found guilty of similar conduct. That factor calls for a significant sentence in this case. A review of recent tax refund fraud cases somewhat comparable in scope to this one reveals that -- perhaps due to the general deterrence concerns noted above -- the government's recommended sentence is in line with those imposed by other courts.

Several other cases involving large OID-based tax fraud schemes have been tried and proceeded to sentencing within the past several years, with the ringleaders receiving sentences comparable to or higher than that advocated by the government here (see Department of Justice Press Releases at Exhibit 9):

- United States v. Jones, et al., Case No. 11-60273-WPD (S.D.Fl.): Defendants filed OID-based refund claims totaling over $160 million on behalf of at least 180 customers. The leaders of the scheme, Michael Beiter and David Clum, were convicted at trial along with scheme participants Dale Peters and Christopher Marrero. Penny Jones, a tax preparer for the scheme, pled guilty before

10

trial. Beiter (criminal history category II)[9] was sentenced to 300 months in custody (consecutive to a 10-year sentence in another tax fraud case), Clum to 293 months, Marrero to 180 months, and Peters and Jones to 144 months each.

- ■ United States v. Brekke, Case No. 10-328-JCC (W.D.Wa.): Brekke, who ran his own solo tax preparation operation, filed OID-based refund claims totaling over $763 million on behalf of nearly 1,000 customers, obtaining payment of $14 million in refunds and approximately $400,000 in fees. Convicted at trial, Brekke (criminal history category I) was sentenced to 144 months in custody.

- ■ United States v. Morris, et al., Case No. 10-317-REB (D.Col.): Defendants filed OID-based refund claims totaling $22 million on behalf of at least 20 customers. Both were convicted at trial. Curtis Morris (criminal history category I), the scheme's tax preparer and one of its leaders, was sentenced to 120 months of custody. Richard Armstrong (criminal history category I), the scheme's 77-year recruiter and promoter, was sentenced to 108 months.

- ■ United States v. Williams, Case No. 11-62-NAM (N.D.N.Y.): Ronald Williams (criminal history category VI), while in custody, filed OID-based refund claims totaling $890 million on behalf of 11 customers. He was convicted at trial, and sentenced to 120 months.

- ■ United States v. Hinz, Case No. 11-586-PAG (N.D.Ohio.): Steven Hinz and three co-defendants filed at least 17 OID-based refund claims totaling $3 million. He pled guilty, and was sentenced to 108 months.

- ■ United States v. Carr, Case No. 11-162-JJB (M.D.La.): Jack Carr, acting largely alone, filed OID-based refund claims totaling $150,000. He was convicted at trial, and sentenced to 78 months.

In addition, a number of defendants have been recently sentenced in large tax refund fraud schemes that did not involve OID-based returns:

---

[9] The government has been able to determine through publicly-filed court document the criminal history category of certain, but not all, of the defendants discussed in this section.

11

- United States v. Dale, Case No. 10-242-MEF-WC (M.D.Al.): Defendants filed approximately 500 fraudulent refund claims totaling $4 million in the names of victims whose identities they had stolen, and obtained over $2.8 million. The scheme leaders, Veronica Dale (criminal history category II) and Alchico Grant (criminal history category III), pled guilty and were sentenced to 334 months and 310 months, respectively.

- United States v. Bonannee, Case No. 12-60143-JIC (S.D.Fl.): Defendants filed approximately 2,000 fraudulent refund claims totaling $11 million in the names of victims whose identities they had stolen, and obtained $1.9 million. The scheme leader, Alci Bonannee, was convicted at trial and sentenced to 317 months. Fellow schemer Sonyini Clay pled guilty and was sentenced to 121 months.

- United States v. Copeland, Case No. 11-281-RBD-JBT (M.D.Fla.): Defendants filed approximately 1,334 fraudulent refund claims totaling approximately $5 million in the names of victims whose identities she had stolen, and obtained $3.5 million. Lead defendant Bryan Copeland (criminal history category II) pled guilty and was sentenced to 264 months.

- United States v. Turner, Case No. 12-169-MHT (M.D.Ala.): James Turner prepared and submitted fictitious bonds in amounts of hundreds of billions of dollars to the U.S. government in payment of federal taxes and various debts, and encouraging others to do the same. He was convicted at trial and sentenced to 216 months, plus restitution of approximately $26,000.

- United States v. Elmore, Case No. 11-157-MEF-CSC (M.D.Ala.): Marsha Elmore (criminal history category V) filed approximately 400 fraudulent refund claims totaling approximately $2.5 million in the names of victims whose identities she had stolen, and obtained $1.1 million. She pled guilty and was sentenced to 184 months, after the government filed a downward departure motion.

- United States v. Mayweather, Case No. 10-20342-JPM (W.D.Tenn.): Rhonda Mayweather filed approximately 500 fraudulent refund claims totaling approximately $2 million in the names of victims whose identities she had stolen, and obtained over $200,000. She pled guilty and was sentenced to 168 months.

- ■ United States v. Pierce, Case No. 10-761 (N.D.Ill.): Katrina Pierce (criminal history category VI) filed approximately 180 fraudulent refund claims totaling approximately $500,000 in the names of victims whose identities she had stolen, and obtained $60,000. She pled guilty and was sentenced to 132 months.

- ■ United States v. Davis, Case No. 11-32 (W.D.N.C.): Charles Davis, acting largely alone, filed fraudulent tax refund claims totaling $1.5 million. He was convicted at trial, and sentenced to 120 months.

- ■ United States v. Derasmus, Case No. 11-198-MEF (M.D.Ala.): Rhashema Derasmus and others filed approximately fraudulent refund claims in the names of hundreds – possibly thousands – of victims whose identities they had stolen, and obtained $1.2 million. She pled guilty and was sentenced to 120 months.

The government's recommended sentence of 216 months is thus far less than that imposed on Beiter, Clum, Bonannee, Dale, Grant, and Copeland, and similar to that imposed on Marrero, Elmore, Turner, and Peters. While somewhat higher than the sentences imposed on some other defendants, the scheme at issue here was larger in scope and sophistication than any of their cases, particularly in terms of the size and complexity of the organization formed to carry out the Old Quest scheme. Moreover, unlike a number of the aforementioned defendants, defendant Ruiz refused to accept responsibility, engaged in vigorous pre-trial litigation, and proceeded to trial.

**E. Downward Variance**

Notwithstanding the various aggravating factors in this case, the government is recommending a significant downward variance from the applicable Guidelines range, for two reasons. First, the government acknowledges the disparity between the intended loss (measured by the refund claims that Old Quest filed) and the actual loss (measured by the refunds paid by the IRS and not recovered).

13

This disparity was due to the IRS's success in discovering and blocking the fraudulent claims, resulting in a rejection rate so overwhelming that it necessarily put the Old Quest conspirators on notice that their scheme was illegitimate.

Second, the government notes that the Court applied a 10-level and 10-year downward variance to Osman Norales, a defendant in a related case who helped to organize a far smaller OID fraud operation that spun off from Old Quest. Although the government submits that defendant Ruiz is substantially more culpable than Norales, the goal of avoiding unwarranted disparities suggests a similar downward variance in this case.

## V.  RESTITUTION

While the PSR did not include a figure for restitution, the government estimates the total at $4,570,097.91. This total breaks down into two components: $2,925,620 in restitution to the government and $1,644,477.81 in restitution to Old Quest customers.

As to the former category, IRS records indicate that approximately $5,645,946 in refunds issued to taxpayers filing through Old Quest. Exhibit 10. While the IRS was able to freeze or recover most of those funds, $2,925,620 remains outstanding. Id.

As to the customers, IRS summary witness Rita Hung testified at trial that $170,756.28, most of it consisting of customers' fees, was deposited into Old Quest's bank accounts in 2008 and $1,756,305.11 in 2009, for a total of $1,928,957.91. Exhibit 11. The government has subtracted the portion of that $1,928,957.91 that resulted from wrongfully-obtained tax refunds from the total

14

deposits, leaving $1,644,477.81 in customers' fees.[10]  The government will separately provide a list of victims to whom restitution is owed.

## VI. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence Ruiz to 216 months in custody, three years of supervised release, a special assessment of $4,200, and $4,570,097.91 of restitution.

---

[10] The total restitution owed to the customers may need to be reduced further, as customers who have been charged in related cases may not qualify as "victims" for restitution purposes.