TRACY L. WILKISON
Acting United States Attorney
BENJAMIN J. BARRON
Assistant United States Attorney
Chief, Santa Ana Branch Office
CHARLES E. PELL (Cal. State Bar No. 210309)
Assistant United States Attorney
Santa Ana Branch Office
     United States Courthouse
     411 West Fourth Street, Suite 8000
     Santa Ana, California  92701
     Telephone:  (714) 338-3542
     Facsimile:  (714) 338-3561
     E-mail:     charles.e.pell2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>                v.<br><br>ARTURO S. RUIZ,<br><br>           Defendant. | No. 8:11-cr-00209-JLS-1<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A); EXHIBIT |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney's Office for the Central
District of California and Assistant United States Attorney Charles
E. Pell, hereby files this response to defendant's motion to reduce
his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  The government
respectfully asks this Court to deny defendant's motion.

//

//

This Response is based upon the attached memorandum of points and authorities, the attached exhibit, the files and records in this case,[1] and such further evidence and argument as the Court may permit.

Dated: June 2, 2021                    Respectfully submitted,

                                       TRACY L. WILKISON
                                       Acting United States Attorney

                                       BENJAMIN J. BARRON
                                       Assistant United States Attorney
                                       Chief, Santa Ana Branch Office


                                              /s/
                                       _____
                                       CHARLES E. PELL
                                       Assistant United States Attorney
                                       Santa Ana Branch Office

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

---

[1] Per the Court's Order, by separate filing, the government will be filing under seal defendant's medical and related records received from the BOP.

## **TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

I.    INTRODUCTION...............................................1

II.   STATEMENT OF FACTS.........................................2

      A.   Defendant's Crimes and Sentence.......................2

      B.   Incarceration and Projected Release Date..............2

      C.   Defendant's Current Motion for Compassionate Release
           and Exhaustion of Administrative Remedies.............2

      D.   The Bureau of Prisons' and Congress's Response to
           COVID-19..............................................3

III.  LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE..................6

IV.   ARGUMENT..................................................9

      A.   Defendant has not established that he is not a danger
           to the community......................................9

      B.   The other § 3553(a) factors also weigh against
           release.............................................12

V.    CONCLUSION...............................................16

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**                                                          **Page(s)**

3

Dillon v. United States,

4
   560 U.S. 817–25 (2010) ........................................ 6

5
United States v. Alam,
   960 F.3d 835 (6th Cir. 2020) ........................... 3, 4, 7

6
United States v. Applewhite, No. 08-CR-60037,

7
   2020 WL 137452 (D. Or. Jan. 13, 2020) ................... 10, 12

8
United States v. Aruda,

9
   993 F.3d 797 (9th Cir. 2021) ............................. 7, 9

United States v. Ayon-Nunez, No. 16-cR-130-DAD,

10
   2020 WL 704785 (E.D. Cal. Feb. 12, 2020) ..................... 13

11
United States v. Chambliss,

12
   948 F.3d 691 (5th Cir. 2020) ................................. 8

13
United States v. Gileno,
   448 F. Supp. 3d 183 (D. Conn. 2020) ......................... 13

14
United States v. Gotti,

15
   433 F.Supp.3d 613 (S.D.N.Y. 2020) ........................... 10

16
United States v. Hir,

17
   517 F.3d 1081 (9th Cir. 2008) ............................... 11

18
United States v. Kelley,

19
   962 F.3d 470 (9th Cir. 2020) ................................. 7

20
United States v. Moreno,
   869 F.3d 942 (9th Cir. 2017) ................................. 7

21
United States v. Raia,

22
   954 F.3d 594 (3d Cir. 2020) ................................. 1

23
United States v. Reynolds,
   956 F.2d 192 (9th Cir. 1992) ................................ 11

24
United States v. Ruffin,

25
   978 F.3d 1000 (6th Cir. 2020) ................................ 8

26
United States v. Urso, No. 03-CR-1382,
   2019 WL 5423431 (E.D.N.Y. Oct. 23, 2019) ................... 10

27
United States v. Woolridge,

28
   2021 WL 415131 at *5 (E.D. LA 2021) ......................... 14

ii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

**Federal Statutes**

18 U.S.C. § 286 ................................................  2

18 U.S.C. § 287 ................................................  2

18 U.S.C. § 3142 ........................................  10, 11, 12

18 U.S.C. § 3553 .........................................  passim

18 U.S.C. § 3582 .........................................  passim

18 U.S.C. § 3583 ...............................................  8

18 U.S.C. § 3624 ...............................................  5

18 U.S.C. § 3582 ..............................................  14

28 U.S.C. § 994 ..............................................  11

**Sentencing Guidelines**

USSG § 1B1.13 ...................................... 8,  9, 12

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    INTRODUCTION**

3      "The COVID-19 pandemic is gripping the nation.  But that is a

4  fate that affects all citizens, . . . not simply those incarcerated."

5  Order, <u>United States v. Rodriguez</u>, CR 11-148-JVS, ECF No. 2021 (C.D.

6  Cal. Mar. 21, 2020).  Thus, the "mere existence of COVID-19 in

7  society and the possibility that it may spread to a particular prison

8  alone cannot independently justify compassionate release."  <u>United</u>

9  <u>States v. Raia</u>, 954 F.3d 594, 597 (3d Cir. 2020).  Although defendant

10  has raised particularized reasons why his risk of serious illness

11  from COVID-19 is particularly acute, the Court should deny

12  defendant's motion (DE 1418) because the risk of possible future harm

13  does not outweigh the many factors under 18 U.S.C. § 3553(a) that

14  establish that a permanent reduction in defendant's sentence would

15  not be prudent or just.

16      Defendant has failed to establish that he would not be a danger

17  to other persons or the community if he were released.  Defendant

18  also ignores other facts that weigh against his release: defendant is

19  a tax protestor who does not respect federal tax laws, and the harm

20  he caused not only to the IRS, but also the many customer-victims

21  whom he defrauded – both in his 1099 OID and land patent schemes.

22      Defendant's request for extraordinary leniency based on health

23  concerns also is particularly weak because the BOP has started its

24  vaccination program.  No inmates at defendant's institution are

25  currently positive, and only a handful have ever tested positive

26  (since recovered).  The existence of the BOP's program weighs against

27  the need for a permanent reduction in defendant's sentence.

28

## II.   STATEMENT OF FACTS

### A.   Defendant's Crimes and Sentence

Having presided over multiple trials involving defendant's Old Quest tax fraud scheme, and the sentencing of around 50 related defendants, the Court is familiar with defendant and his schemes.

On January 30, 2013, defendant was convicted at trial of one count of violating 18 U.S.C. § 286 (Conspiracy to Defraud the United States with Respect to Claims) and 41 counts of violating 18 U.S.C. § 287 (False, Fictitious, or Fraudulent Claims Against the United States).  The PSR calculated defendant's advisory Sentencing Guidelines imprisonment range as 2,580 months and recommended a custodial sentence of 216 months, which was a downward variance equivalent to a 13-level departure from that range.

The government likewise recommended a sentence of 216 months' imprisonment.

On September 25, 2013, this Court sentenced defendant to 14 years (168 months) of prison and $2,925,620 in restitution.

### B.   Incarceration and Projected Release Date

Defendant is currently serving his sentence at Big Spring (Flightline) CI.  His projected release date is October 1, 2023.

### C.   Defendant's Current Motion for Compassionate Release and Exhaustion of Administrative Remedies

On or about March 8, 2021, defendant submitted a compassionate release request with the warden.

On or about March 16, 2021, facility administrator B. Thompson denied defendant's request.

Now, before this Court, defendant renews his compassionate-release request based on his medical conditions of high blood

1   pressure and that he is "an issulin [sic] Diabetic dependent"  (DE

2   1418 at page 11/25), which he claims makes him "at high risk of

3   complications from COVID-19."   However, at the foundation of

4   defendant's compassionate-release motion before this Court are

5   allegations about the potential for an uncontained COVID-19 outbreak

6   at his BOP facility.

7        **D.   The Bureau of Prisons' and Congress's Response to COVID-19**

8        The political branches have not been "insensitive in responding

9   to the COVID-19 pandemic."  United States v. Alam, 960 F.3d 835, 836

10  (6th Cir. 2020).  To the contrary, BOP has taken aggressive steps to

11  protect inmates' health and to resist the spread of COVID-19.  DOJ,

12  Statement of BOP Director and Medical Director Before the Senate

13  Committee on the Judiciary (Jun. 2, 2020) ("BOP Senate Testimony").[1]

14       "[M]aintaining safety and security of BOP institutions is [the

15  BOP's] highest priority."  BOP, Updates to BOP COVID-19 Action Plan:

16  Inmate Movement (Mar. 19, 2020).[2]  Thus, the BOP Director recently

17  emphasized that the "response [to COVID-19] is the Bureau's top

18  priority."  BOP, Statement from BOP Director (Mar. 26, 2020)

19  (Statement from BOP Director).[3]

20       Consistent with its "well-established history of managing and

21  responding to communicable disease outbreaks," BOP Senate Testimony

22  at 2, the BOP implemented its Pandemic Influenza Protocol in January

23

24  _____

25       [1] available at
    https://www.bop.gov/resources/news/pdfs/06022020_written_statement.pd
26  f.
       [2] available at
27  https://www.bop.gov/resources/news/20200319_covid19_update.jsp.
       [3] available at
28  https://www.bop.gov/resources/news/20200326_statement_from_director.j
    sp.

1  2020---modified as a COVID-19 Action Plan.  BOP, Action Plan Phase V

2  (Mar. 31, 2020) ("Action Plan Phase V").[4]

3      Since then, the BOP has serially escalated its response.  BOP,

4  Bureau of Prisons Update on COVID-19 (Mar. 24, 2020).[5]  On August 31,

5  2020, the BOP adopted a comprehensive Pandemic Response Plan that

6  applies to all BOP facilities.  Federal Bureau of Prisons, Overview

7  ofCOVID-19 Pandemic Response Plan, August 31, 2020 ("Pandemic

8  Response Plan").[6]  The eleven modules of the Pandemic Plan provide

9  for each BOP facility to prepare for, respond to, and recover from

10 outbreaks of COVID-19.  Id.

11     The BOP has continued working with the CDC, confirming that its

12 approach aligns with current CDC guidance for COVID management in

13 correctional facilities.  Federal Bureau of Prisons, Correcting Myths

14 About BOP and COVID-19, at 1 ("Correcting Myths").[7]  COVID-19-

15 positive inmates are isolated from fellow inmates and receive medical

16 treatment.  Correcting Myths, supra, at 2.  "Inmates whose conditions

17 cannot be managed within the institution are sent to the local

18 hospital[.]"  Id.

19     In December 2020, BOP started its vaccination program for staff

20 and inmates.  It is the BOP's highest priority to continue to

21 mitigate the spread of COVID-19 in its facilities and as of February

---

[4] available at
https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

[5] available at
https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

[6] available at
https://www.bop.gov/foia/docs//Overview_of_COVID_Pandemic_Response_Plan_08312020.pdf

[7] available at
https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf

22, 2021 all BOP facilities have received some doses of a vaccine.[8]
The first priority is to vaccinate staff to prevent transmission in
and out of facilities, but inmates also are being vaccinated.[9]
According to clinical trials, the Pfizer-BioNTech vaccine is 95%
effective and the Moderna vaccine is 94.1% effective.[10]   As of
yesterday, June 1, 2021, 186,138 staff and inmates have received a
first or second dose of a COVID-19 vaccination.[11]

The BOP has also released prisoners using its statutory
authorities, which include far more flexible remedies than permanent
reduction of a sentence under 18 U.S.C. § 3582(c)(2).  In particular,
the CARES Act, which Congress passed to address the COVID-19 crisis,
vastly increased BOP's statutory home-confinement authority.  See
Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"),
Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (March 27,
2020) (suspending eligibility limitations imposed by 18 U.S.C.
§ 3624(c)(2)).

Thus, the BOP is "urgently reviewing all inmates" to determine
their eligibility, increasing resources to "review and make
appropriate decisions as soon as possible."  Federal Bureau of
Prisons, Home Confinement (Apr. 5, 2020) ("BOP, Home Confinement").[12]

---

[8] https://www.bop.gov/resources/news/20210223_vaccination_status.jsp.

[9] See https://www.bop.gov/resources/news/20210116_covid_vaccine_efforts_commended.jsp.

[10] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html; https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html.

[11] https://www.bop.gov/coronavirus/.

[12] available at https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.

5

1   Since March 26, 2020, the BOP has placed an additional 26,162 inmates
2   on home confinement.  BOP, COVID-19 Coronavirus (updated regularly).[13]
3        The gravity and severity of these measures reflect BOP's
4   commitment to fighting COVID-19 and protecting inmates.  Nonetheless,
5   BOP has not been immune from the pandemic.  Currently, at defendant's
6   facility - Big Spring (Flightline) CI, only **0** inmates are currently
7   diagnosed with COVID-19.  An additional 33 inmates were previously
8   diagnosed; they have recovered.  Across the country, as of yesterday,
9   June 1, 2021, **56** BOP inmates in BOP custody---out of a total of about
10  150,000---are currently diagnosed with COVID-19; an additional 45,367
11  inmates have recovered, and 237 have died (five while on home
12  confinement).  BOP, COVID-19 Coronavirus (updated daily at 12pm
13  Pacific).[14]
14  **III.  LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE**
15       A compassionate-release motion is a request for a permanent
16  reduction in a defendant's federal sentence.  A district court
17  generally "may not modify a term of imprisonment once it has been
18  imposed."  18 U.S.C. § 3582(c); see Dillon v. United States, 560 U.S.
19  817, 824-25 (2010).  Compassionate release is one of the few
20  exceptions to this rule, allowing a court to "reduce the term of
21  imprisonment (and . . . impose a term of probation or supervised
22  release with or without conditions that does not exceed the unserved
23  portion of the original term of imprisonment)[.]"  18 U.S.C.
24  § 3582(c)(1).
25       Because this relief is both drastic and permanent, it is subject

---

27  [13] available at https://www.bop.gov/coronavirus/index.jsp (last
visited 06/01/2021).
28  [14] available at https://www.bop.gov/coronavirus/index.jsp (last
visited 06/01/2021).

to strict statutory conditions.

First, a district court can evaluate a defendant's request for compassionate release only "after the defendant has fully exhausted all administrative rights" before the BOP.  Specifically, a defendant must wait until the "lapse of 30 days from the receipt of such request by the warden of the defendant's facility[.]"  18 U.S.C. § 3582(c)(1)(A).  This requirement is mandatory.  Raia, 954 F.3d at 597; Alam, 960 F.3d at 834.  Defendant has met this requirement.

Second, in evaluating compassionate-release requests, courts must determine whether a defendant has presented an "extraordinary and compelling" reason for release. 18 U.S.C. § 3582(c)(1)(A)(i).[15] The statute does not define the scope of the "extraordinary and compelling" requirement, and district courts have discretion to determine which reasons are "extraordinary and compelling." See United States v. Aruda, 993 F.3d 797, 800-01 (9th Cir. 2021). Nonetheless, the plain meaning of the term "extraordinary and compelling" establishes Congressional intent that only rare circumstances should qualify for release.  Section 3582 does not authorize a "plenary resentencing proceeding," let alone a re-litigation of facts.  See United States v. Moreno, 869 F.3d 942, 956 (9th Cir. 2017) (citing Dillon); United States v. Kelley, 962 F.3d 470, 477 (9th Cir. 2020) (the First Step Act "does not permit a plenary resentencing").

Defendant probably has met the "extraordinary and compelling" requirement.  Namely, he suffers from high blood pressure and

---

[15] 18 U.S.C. § 3582(c)(1)(A)(ii) authorizes an alternative basis for release, but it does not apply to defendants who are less than 70 years old.

diabetes*,* which are chronic medical conditions identified by the Centers for Disease Control as a risk factor for COVID-19 complication.  See generally Centers for Disease Control, Coronavirus Disease 2019 (COVID-19)--People Who Are At Higher Risk.[16]  Such serious, chronic health conditions are ones from which defendant "is not expected to recover," and which--in the presence of COVID-19--may be both "serious" and "substantially diminish[] the ability of the defendant to provide self-care" in a correctional environment.  USSG § 1B1.13, comment (n.1(A)(ii)(I)).

Third, § 3583(c)(1)(A) requires the Court to consider the "factors set forth in section 3553(a) to the extent that they are applicable."  Even if the other requirements are met, courts should deny a motion for release if the defendant does not establish that the balance of the applicable § 3553(a) weighs in favor of release.  "This last [§ 3553(a)] requirement confirms an overarching point: The district court has substantial discretion.  The statute says that the district court 'may' reduce a sentence if it finds the first two requirements met; it does not say that the district court must do so."  United States v. Ruffin, 978 F.3d 1000, 1005 (6th Cir. 2020).  See also, United States v. Chambliss, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court did not abuse its discretion in denying defendant's motion based on § 3553(a) balancing despite diagnosis of terminal illness); United States of America v. Hernandez, EDCR 13-00122-VAP, ECF No. 121, at 7 (C.D. Cal. August 19, 2020) ("[A]lthough Defendant met his burden to show he suffers from a qualifying medical

---

[16] available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed 06/01/2021).

condition, the relevant 18 U.S.C. § 3553(a) factors weigh against reducing his sentence").

As explained below, defendant has not met this requirement.

**IV.  ARGUMENT**

Any compassionate-release decision--even for a statutorily eligible defendant--must also consider the factors under 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A)(i).  Defendant barely addresses these factors in his motion, and nowhere does he indicate he has abandoned his tax protestor beliefs.  Those factors--which this Court already considered when imposing defendant's 14-year sentence--do not support his request for premature, permanent release.  They support his original sentence.

Defendant's risk from a possible symptomatic case of COVID-19 does not by itself meet the requirements for release.  As the Third Circuit held, "[w]e do not mean to minimize the risks that COVID-19 poses in the federal prison system," but the "mere existence of COVID-19 in society and the possibility that it may spread to a particular prison cannot independently justify compassionate release"--particularly given "BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."  Raia, 954 F.3d at 597.

As discussed below, the Section 3553(a) factors do not support a shorter sentence for defendant.

> **A.  Defendant has not established that he is not a danger to the community.**

"Danger to the safety of other persons or the community" is no longer is a separate statutory requirement for compassionate-release eligibility because USSG § 1B1.13 no longer is binding.  See, Aruda,

WL 1307884 at *4.  Nonetheless, the Court still must consider danger because it is one of the listed § 3553(a) factors and the government urges the Court to exercise its discretion to give great weight to defendant's failure to establish that he is not a danger under the criteria identified in 18 U.S.C. § 3142(g).  See, 18 U.S.C. § 3553(a)(2)(C) ("to protect the public from further crimes of the defendant").

Courts routinely have denied motions by defendants who have not made this showing.  See United States v. Dancy, EDCR 19-101- PA, ECF No. 76, at 4 (C.D. Cal. August 18, 2020) (defendant has ten criminal history points and remains a danger despite his medical ailments); accord United States v. Gotti, 433 F.Supp.3d 613, 619-20 (S.D.N.Y. 2020) (release was inappropriate regardless of extraordinary and compelling circumstances; defendant posed a continuing danger to the public); United States v. Applewhite, No. 08-CR-60037, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020) (denying compassionate release for seriously ill 80-year-old inmate based on danger); United States v. Urso, No. 03-CR-1382, 2019 WL 5423431, at *3 (E.D.N.Y. Oct. 23, 2019) (defendant remains a danger based on the serious nature of his criminal conduct).

The record here precludes any such finding.  To the contrary, defendant poses a very real danger to the community.  Defendant is a fraudster, which included his multi-year 1099-OID fraud (which he orchestrated and ran) but also the precursor land patent scheme. Moreover, defendant has had disciplinary problems in prison.  (Exh.-1.)  Moreover, nowhere has defendant indicated that he has (finally) rejected his previous "tax protestor" beliefs and behavior.  And he proposes to live with his wife and/or children, who were involved

1    with the Old Quest fraud.

2        Nothing about the COVID-19 pandemic reduces defendant's danger.

3    Danger to the community is not limited to physical violence.  It can

4    take different forms.  See, e.g., United States v. Reynolds, 956 F.2d

5    192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases,

6    encompass pecuniary or economic harm.").  Given his previous schemes

7    and his tax protestor beliefs, defendant remains an economic danger

8    to the community.

9        In the current climate, irresponsible social habits also gravely

10   endanger the community.  United States v. Hir, 517 F.3d 1081, 1088

11   (9th Cir. 2008) ("community," within the meaning of 18 U.S.C. § 3142,

12   is not necessarily confined to local geography).  All California

13   residents are currently required to "heed the current State public

14   health directives" to avoid the spread of COVID-19.  California

15   Executive Order N-33-20 (March 19, 2020).[17]  Such rules, though

16   enforceable by peace officers, rely largely on voluntary compliance.

17       It appears unclear from defendant's medical records whether he

18   has received the COVID vaccination. However, his medical records do

19   show that over the years, he has routinely refused to receive

20   vaccinations for MMR, Tdap, and influenza, as well as to receive

21   treatment for blood testing.  Defendant's history reflects an

22   unwillingness to follow rules and a disregard for the welfare of

23   others--characteristics that now have potentially fatal consequences.

24       Finally, defendant's age and purported rehabilitation alone do

25   not satisfy his burden.  The standard for compassionate release is

26   not just whether someone is elderly and has performed well in prison.

27

28       [17] available at https://covid19.ca.gov/img/Executive-Order-N-33-
     20.pdf.

11

To the contrary, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." USSG § 1B1.13, comment. (n.3). Even being a "model inmate" does not warrant an "abrupt departure from [a defendant's] current sentence." Applewhite, 2020 WL 137452, at *2. Moreover, because there is a significant difference between doing well in prison and doing well in society, this Court, in evaluating the danger posed by defendant, cannot ignore the nature and circumstances of the offense and defendant's ties to the community. 18 U.S.C. § 3142(g). An examination of those factors weighs against early release.

Defendant was over 50 years when he committed these crimes, so that he is now in his 60s does not really make him less of a threat to the community, particularly given that he is an economic danger.

**B.    The other § 3553(a) factors also weigh against release.**

First, and most centrally, the facts of the case do not merit a reduction of defendant's sentence. Defendant was a leader of his years long fraud scheme that not only attempted to sting the federal fisc of more than $100 million, but wreaked havoc on the lives of his victims, who trusted him and his 1099-OID gibberish. The Court recalls the customer testimony, including those who lost their homes and suffered other adverse consequences because they believed defendant's lies. Defendant's severe sentence was justified, and his appeal failed.

Second, although defendant's health condition is plausibly qualifying under USSG § 1B1.13, he provides no evidence that the BOP is unable to manage that condition--particularly given the low number (0) of current COVID-19 infections in his designated facility.

12

Particularly considering both how the BOP has addressed COVID-19 generally, and the lack of specific concerns at defendant's facility (Big Spring (Flightline) CI), defendant's circumstances are not sufficiently extraordinary and compelling to justify a modified sentence.  Indeed, defendant's arguments totally overlook the BOP's ability to treat infectious disease.  Even chronic conditions "that can be managed in prison are not a sufficient basis for compassionate release."  United States v. Ayon-Nunez, No. 16-cR-130-DAD, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020).  Thus, the Court "cannot assume that the Bureau of Prisons will be unable to manage [any] outbreak or adequately treat [defendant] should it emerge at his correctional facility while he is still incarcerated."  United States v. Gileno, 448 F. Supp. 3d 183, 188 (D. Conn. 2020) (denying compassionate-release motion in COVID-19-related case involving a defendant who raised specific health concerns); accord United States v. Shah, No. 10-70-CJC, ECF No. 329, at 3 (C.D. Cal. March 30, 2020).  By defendant's logic, such conditions would universally qualify convicted inmates for shorter sentences given the present pandemic.  That is and cannot be the case.

Indeed, there is nothing to suggest that defendant would be safer outside of custody than in custody.  Defendant's circumstances are--in the present pandemic--far closer to ordinary than "extraordinary."  To grant defendant a sentence reduction based such facts would not satisfy the 18 U.S.C. § 3553(a) factors; it would result in a windfall.

Third, it bears emphasis that defendant's health condition is not itself dire--as his own medical and prison records reflect.  High blood pressure and diabetes are not uncommon for people in their

13

sixties.  According to BOP medical records, defendant presents as care level 2 medical health (Stable, Chronic Care) inmate.  And defendant is not at a BOP medical facility.  While not dispositive, many of the defendants who obtained release were at medical facilities which means they already needed a higher level of care.

Fourth, the existence of the BOP's vaccination program should reduce the possibility of defendant becoming infected with COVID. Although it is not certain when defendant will have an opportunity to be vaccinated, the vaccination of other staff and inmates at defendant's facility should overtime decrease the possibility that defendant will be infected.  "[A]s the availability of the COVID-19 vaccine continues to increase in the coming months, especially for individuals in correctional facilities, the risk posed by COVID-19 to inmates will likely continue to decrease."  United States v. Woolridge, 2021 WL 415131 at *5 (E.D. LA 2021).

Fifth, defendant has failed to propose an adequate release plan- -a factor relevant to eligibility, and which the BOP carefully considers before recommending compassionate release.  Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019).[18]  Defendant must, pursuant to BOP regulations, not only indicate where he will reside and how he will support himself, but how he will "receive medical treatment and how the inmate will pay for such treatment."  Id.  He has failed to do so.

In fact, his plan to live with his wife and/or children (two of which – son and daughter-in-law were convicted in this case) does not

---

[18] available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

1  bode well.  And his listed plan with no prospects of a job does not

2  indicate a likelihood of success if released early.

3      Moreover, defendant committed a huge fraud that not only

4  victimized the government, but also victimized all the customer-

5  victims who believed his lies about the 1099-OID scheme and the land

6  patent program.  Defendant was the architect and undisputed leader of

7  what is, by most measures, the largest and most sophisticated OID-

8  based tax fraud scheme in history.  Through his company of dozens of

9  employees and agents, dedicated entirely to the scheme, defendant

10  attempted to defraud U.S. taxpayers of hundreds of millions of

11  dollars. He succeeded in cheating hundreds of desperate homeowners --

12  his customers -- out of hundreds of thousands of dollars in fees,

13  both through the tax scheme and a preceding "land patent" fraud. At

14  no time has defendant demonstrated remorse or an intent to reform his

15  conduct; instead, he went to great lengths to avoid responsibility.

16      Equally significant was the nature of the victims whom defendant

17  targeted, and the impact the scheme had on them.  Many of Old Quest's

18  customers were uneducated immigrants with limited English skills and

19  low incomes, who were behind on their mortgages, in danger of losing

20  their homes, and desperate for a solution.  Defendant marketed to

21  them not one but two fraudulent schemes, charging them thousands of

22  dollars apiece for services that were worse than worthless.  When the

23  customers wound up with no homes, no refunds, and thousands of

24  dollars in IRS fines, defendant and his co-conspirator Francisco

25  Mendoza took what funds they could (over a quarter-million dollars)

26  and departed, leaving the customers to fend for themselves.

27      Apart from the underlying scheme for which he was convicted,

28  defendant also was a tax cheat and protestor.  As detailed at his

trial, defendant failed to file tax returns for years 2002-2005, 2007, and 2009, even though he made over $67,000 in income for 2002, over $86,000 in 2003, and over $195,000 in 2004, and obtained hundreds of thousands of dollars in 2009 from the charged scheme. Witness M.E. even testified that Ruiz boasted to her about never paying taxes.

At bottom, granting compassionate release to defendant would undermine the 18 U.S.C. § 3553(a) factors. The law, and the specific facts and circumstances of defendant's case, neither demand nor endorse that result.

**V.   CONCLUSION**

Defendant's motion should be denied for the reasons set forth above. Finally, the government requests that, if this Court ultimately grants relief, the government be given an opportunity to brief appropriate conditions--including a release plan, a mandatory quarantine, and a period of home confinement as a condition of supervised release. See 18 U.S.C. § 3582(c)(1)(A).

16